# EXHIBIT 1

1 | Gary Gotto, Attorney Bar No. 007401
Ron Kilgard, Attorney Bar No. 005902
2 | Keller Rohrback, P.L.C.
3101 North Central Avenue, Suite 900
3 | Phoenix, Arizona 85012-2600
(602) 248-0088
4 |
Lynn Lincoln Sarko
5 | Michael D. Woerner
Gretchen F. Cappio
6 | Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
7 | Seattle, Washington 98101-3276
(206) 623-1900
8 |
(See Signature Block for Additional Attorneys)
9 |
Attorneys for Plaintiffs
10 |

FILED ___ LODGED
RECEIVED ___ COPY

MAY 03 2004

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ E DEPUTY

THIS DOCUMENT IS NOT IN PROPER FORM ACCORDING
TO FEDERAL AND/OR LOCAL RULES AND PRACTICES
AND IS SUBJECT TO REJECTION BY THE COURT.

REFERENCE: _____
(Rule Number/Section)

11 | UNITED STATES DISTRICT COURT
12 | DISTRICT OF ARIZONA

**CV '04 0916 PHX FJM**

13 | NANCY HAUGEN, MICHAEL F. MAGNAN, )  NO.
KAREN L. MAGNAN, ROSE M.          )
14 | IANNACCONE, PRESLEY C. PHILLIPS, )  COMPLAINT UNDER INVESTMENT
ANDREA M. PHILLIPS, and CINDY     )  COMPANY ACT OF 1940
15 | SCHURGIN, for the use and benefit of )
FIDELITY MAGELLAN AND FIDELITY    )  (THIS COMPLAINT DOES NOT
16 | CONTRAFUND,                      )  ALLEGE LATE TRADING OR
                                    )  MARKET TIMING CLAIMS)
17 |                    Plaintiffs,  )
                                    )
18 |        v.                       )
                                    )
19 | FIDELITY MANAGEMENT & RESEARCH  )
COMPANY and FMR CO., INC.,         )
20 |                                 )
                    Defendants.     )
21 | _____

22 |    Plaintiffs, Nancy Haugen, Michael F. Magnan, Karen L. Magnan, Rose M. Iannaccone,

Presley C. Phillips, Andrea M. Phillips, and Cindy Schurgin for the use and benefit of Fidelity

Magellan and Fidelity Contrafund file this Complaint against Defendants Fidelity Management

& Research Company ("FMR") and FMR Co., Inc. ("FMRC") (collectively the "Defendants")

and allege as follows:

1

# I. INTRODUCTION

1.     The Plaintiffs are shareholders in two very large mutual funds (technically known as open-end registered investment companies).  Fidelity Magellan until recently was the largest actively managed mutual fund in the country.  This fund, with assets under management *in excess of $66 billion,* was formed, distributed, advised and managed by the Defendants.  Fidelity Contrafund has assets under management in excess of $37 billion.  Fidelity is one of the largest investment advisors in the world.  It manages more mutual fund industry assets than any other manager.

2.     The Plaintiffs own shares in the Fidelity Magellan Fund and/or Fidelity Contrafund (hereinafter the "Funds").

3.     The Defendants are part of the Fidelity organization and are registered investment advisers (or affiliated persons of investment advisers) to the Funds and over 270 other (and smaller) mutual fund and additional institutional client portfolios.  The Defendants owed (and continue to owe) fiduciary duties to the Funds, the Plaintiffs and all shareholders of the Funds.

4.     The Funds pay the Defendants significant fees for managing the Funds.  In percentage terms, those fees may look benign, yet in dollar terms, or in comparison to fees charged to comparable institutional portfolios, they are staggering.

5.     Management includes selecting securities for the Funds to buy, sell or hold (the "Portfolio Selection Services") and administrative services associated with such advice.  The management fees paid by the Funds include a flat fee based on assets under management in each Fund, a variable fee based on assets under management in all Fidelity mutual funds and a performance fee adjustment.

6.     In the money management business, investment advisors (including the Defendants) routinely offer their services to institutional clients with "breakpoints" (lower fees as assets increase) because of extraordinary "economies of scale" inherent in this industry.  Once an adviser has sufficient assets to reach a critical mass, each additional dollar of revenue is

almost pure profit:  In the mutual fund industry, the critical mass point for a fund is reached when fund assets total approximately one hundred million dollars ($100,000,000). "By definition, if you cut management fees [payable to a mutual fund investment adviser], that falls just about dollar for dollar to the bottom line," according to the money management consulting firm Casey, Quirk & Acito.

7.    The "pure profits" generated by these economies of scale are appropriated by the adviser and are routinely shared with other institutional clients.  Although required by law to also be similarly shared with mutual fund clients (including the Funds), the Defendants have failed to do so.

8.    These economies of scale are realized quickly as assets under management grow. Fidelity offers breakpoints to other (non-mutual fund) investors with as little as $500,000 under management.

9.    The Fidelity Magellan Fund is one of the largest actively managed mutual funds in the world.  Fidelity Contrafund is close behind.  The larger a portfolio, the greater the benefits from economies of scale, and the less it costs to provide investment advisory services. Eventually, when portfolios become as large as those of the Funds, the cost of providing Portfolio Selection Services for each additional dollar of assets under management approaches zero.

10.    The Portfolio Selection Services that the Defendants provide to the Funds are identical to the portfolio selection services that the Defendants provide other institutional clients. Unlike the advisory contracts with the Funds, however, the contracts negotiated with other Fidelity institutional clients are the product of arms' length negotiations and result in far lower fees even though those clients' portfolios are far smaller than those of the Funds.

11.    These much higher fees that the Defendants receive for Portfolio Selection Services for the Funds (the "Portfolio Selection Fees") for the same services provided to other

3

institutional clients with much smaller portfolios could not have resulted from arms' length negotiations. This is even more evident when adding to the Portfolio Selection Fees all other benefits ("fallout benefits") received by the Defendants by virtue of its relationship with the Funds.

12. The receipt by the Defendants of the Portfolio Selection Fees from the Funds constitutes a breach of Defendants' fiduciary duties. Accordingly, the Plaintiffs seek to rescind the advisory contracts in place between the Defendants and the Funds and to recover the Portfolio Selection Fees paid by the Funds to the Defendants during the period commencing one year prior to the filing of this Complaint through the date of final judgment after trial.

### The Investment Company Act of 1940

13. In 1940, Congress enacted the Investment Company Act of 1940, 15 U.S.C. § 80a-l et seq. (the "ICA"). The ICA was designed to regulate and curb abuses in the mutual fund industry and to create standards of care applicable to investment advisers such as Defendants. In the 1960s, it became clear to Congress that investment advisers to equity mutual funds were gouging the funds with excessive fees. As a result, § 36(b) was added to the ICA in 1970 (primarily to remedy excessive fees charged by mutual funds such as those owned by Plaintiffs) and created a federal cause of action for breach of fiduciary duty by investment advisers such as the Defendants. The statute provides for quasi-derivative claims (with no demand requirement).

14. Section 36(b) provides in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment adviser, or any other person

4

enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect to such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person

### Economies of Scale

15.    Significant economies of scale exist in the investment advisory industry, especially in the area of providing investment advisory services (such as the Portfolio Selection Services) to clients such as the Funds. Economies of scale are created when (as with the Funds) assets under management increase more quickly than the cost of advising and managing those assets. At some point (exceeded by the Funds because of their huge size), the additional cost to advise each additional dollar in the Funds (whether added by a rise in the value of the securities or additional contributions by current or new shareholders) approaches zero.

16.    For example, the cost of providing Portfolio Selection Services to the Funds may be $X for the first $100 million of assets under management but the cost for providing those same services for the next $100 million is a mere fraction of $X. This is true in part because each Fund's portfolio investment objectives are set forth in its offering documents and additional dollars contributed by shareholders are simply invested in the same core portfolio of securities. In addition, when assets under management increase in value over time as markets rise or existing shareholders purchase additional shares (with no change in the composition of the Funds' portfolios or number of shareholders), there are no additional Portfolio Selection Services' costs incurred by the Defendants.

17.    These economies of scale belong to the Funds and the Plaintiffs, not the Defendants.

18.    Recognizing the existence of these economies of scale, virtually all investment advisors offer "breakpoints" to some clients. These breakpoints specifically reflect that costs decline dramatically as assets under management increase by, for example, lowering the

5

management and other fees (as a percentage of assets but *not* in total dollars) as assets grow. The agreements between the Defendants and the Funds do *not* incorporate breakpoints even though the Defendants offer breakpoints to other institutional clients.

19.    In addition, technology has lowered the costs to the Defendants of providing the Portfolio Selection Services. For example, it has become far easier and less expensive for the Defendants to obtain research about potential investments, and to communicate with the Funds and their shareholders, than regulators and courts in the early days of Section 36(b) could ever have imagined. The Defendants benefit from the widespread use of computers with exponentially greater computing power today than those of 20 years ago, company and stock research is readily and instantly available on the Internet, and the Defendants are able to transact business with current and potential shareholders on the Internet. All of this dramatically lowers the Defendants' costs and should also have resulted in significantly lower Portfolio Selection Fees over time. Unfortunately, those fees (in both percentage and dollar terms) have not declined as they should have but increased because of the Defendants' violation of their fiduciary duties.

20.    Notable academic research confirms the long-standing existence of significant economies of scale in the mutual fund industry that are not passed on to shareholders. *See,* John P. Freeman & Stewart L. Brown, Mutual Fund Advisory Fees: The Cost of Conflicts of Interest, 26 J. Corp. L. 610 (2001) (the "Freeman & Brown Study") [Ex. 1].

21.    Furthermore, both the Securities and Exchange Commission (the "SEC") and the Government Accounting Office (the "GAO") also confirmed, in June of 2000, that economies of scale exist in the provision of Portfolio Selection Services. *See* SEC Report at 30-3 1 [Ex. 2]; Government Accounting Office, Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives (June 2000) ("GAO Report"), at 9 [Ex. 3].

22.     The assets under management in the Funds have grown dramatically in the past decade, even accounting for the stock market declines experienced in recent years. For example, in early 1994, the Fidelity Magellan Fund already had $33 billion in assets under management and Defendants were paid approximately $186 million in management fees. From the September 2003 semi-annual report (the most recent data available), Fidelity Magellan Fund assets increased further to over $62 billion while fees increased to over $357 million in a single year for a single fund portfolio. At one time Magellan Fund's assets totaled more than one hundred billion dollars ($100,000,000,000), making it the largest mutual fund in history.     At recent hearings before the United States Senate, mutual fund industry pioneer John C. Bogle commented on Magellan's size and behavior in answer to a question posed by Senator Lautenberg:

> LAUTENBERG: Just this closing question: Is there a point in time when size becomes a determinant as to whether or not another fund under the same management company must be created so that there isn't just such a mass in one place that can destroy a company's value if there's a decision to sell?

> BOGLE:  You -- well, you bring up a very, very good point, Senator Lautenberg.  We are in this business -- when you're in the business of asset gathering and fee maximizing, which is what a management company does -- you can argue, it's fine, but that's their business -- you tend to let funds grow to an awesome size.

> One of the firms in the industry [Fidelity Magellan] grew actually to $100 billion. They had a 1-percent management fee.  They got $1 billion paid for investment management, and, of course, about five years before that, they turned into an index fund.

> They didn't want to be an index fund, but they had no other choice.  They couldn't buy small-cap stocks or mid-cap stocks in any appreciable way.

> So you can observe them now kind of going along the index route, which is fine for me and I love it, except that its costs -- it means they're destined to fall short of the index  return. So, yes, we let funds go -- get too large a size, and, no, we don't cut funds off at a reasonable level.

7

> And, number three, it's very difficult to replace with another fund. In other words, they say we're going to close Fund A and start Fund B, unless, as we did at Vanguard in the case of Windsor I and Windsor II, we used a totally different adviser. If you use the same adviser, clearly, the problems don't go away.
>
> But it's another area that I believe the SEC should be looking very carefully at. I don't think that's a legislative issue on fund size because I don't think any of us can articulate it very well.
>
> But, yes, there is a size beyond which you cannot differentiate yourself because the cost of portfolio transactions simply overpowers your ability to move the money.

Bogle's testimony highlights a double-edged problem plaguing Fidelity's management of Magellan over the last 10 years: the fund is a de facto index fund, with the fees being vastly excessive in comparison with index fund costs. Thus the fund is condemned to perform at an average level at best, while falling behind leading indexes due to the cost drag.

While the size of the Funds has grown dramatically, the nature and quality of the Portfolio Selection Services rendered by Defendants has not changed other than that Magellan has been converted into a de facto index fund. Indeed, the number of securities in the Funds' portfolio has tended to remain relatively constant, suggesting that the research associated with providing the Portfolio Selection Services was unchanged as the size of the Funds' portfolios grew dramatically and could have been provided for the same dollar fee with no percentage or dollar increase.

23.    Despite this, the Portfolio Selection Fees paid to Defendants (and accepted by them in violation of their statutory fiduciary duties) have grown dramatically and are disproportionately large in relationship to the services rendered to Plaintiffs.

24.    Although owned by and owed to the Funds, the benefits created by economies of scale have been (and continue to be) kept by the Defendants and are not being passed on to the Funds and their shareholders in violation of Section 36(b).

**Defendants' Portfolio Selection Services to Other Clients**

25.    The gross disproportionality of the fees paid to Defendants for Portfolio Selection Services is also demonstrated by a comparison of the fees they receive from other clients for the same services.  In some cases, Defendants charged (and continue to charge) the Funds fees two times or more in percentage terms and hundreds of times higher in dollar terms compared to those charged to other clients with much smaller portfolios for the very same services.  The fees are particularly outrageous in comparison to index funds.

26.    In particular, Defendants charge these other clients as little as 20 basis points (0.20% of assets) for identical Portfolio Selection Services including all administrative costs.  Plaintiffs are charged at least 40 basis points (.40%) for Portfolio Selection Services that include only a portion of the Funds' administrative expenses (significant additional charges for administration, trading and other expenses are also paid for separately by the Funds to the Defendants and lumped together as "other expenses").

**The Funds' Conflicted Board of Trustees**

27.    The fees paid to Defendants are technically approved by the Funds' board of directors (referred to as the "board of trustees" by Fidelity).  The Funds are governed by a common board of trustees.  A majority of the Fund's board must be comprised of statutorily presumed "disinterested" directors as that term is defined in § 10 of the ICA.

28.    There is a lack of independence and conscientiousness by the trustees in reviewing the Portfolio Selection Fees paid by the Funds.  The trustees' lack of independence and conscientiousness establishes Defendants' violation of § 36 of the ICA, regardless of whether the trustees are presumed "independent" by § 10 of the ICA.  The trustees are in all practical respects dominated and unduly influenced by Defendants in reviewing fees paid by the Funds.

9

29.    Each of the statutorily presumed "disinterested" directors or trustees serves on the boards of 277 different Fidelity mutual funds, and is paid approximately $263,000 annually for attending approximately 11 meetings per year.  Further, Defendants do not provide the trustees with sufficient information for them to fulfill their obligations, and when information is supplied, it is cursorily reviewed and not meaningfully considered.

### Nature of Relief Requested

30.    Although the Portfolio Selection Fees challenged may appear to be very small on a shareholder-by-shareholder basis, they are huge in absolute terms and, even on a shareholder-by-shareholder basis, cause a dramatic decrease in Plaintiffs' investment returns over time.  Arthur Levitt, past Chairman of the SEC, has observed this and is critical of what he calls the "tyranny of compounding high costs:"

> Instinct tells me that many investors would be shocked to know how seemingly small fees can, over time, create such drastic erosion in returns....In the years ahead, what will mutual fund investors say if they realize too late their returns have fallen hard under the weight of compounding fees?

Arthur Levitt, Jr., Inaugural address: Costs Paid with Other People's Money, Address at Fordham University School of Law (Nov. 3, 2000), in 6 Fordham J. Corp. & Fin. L. 261, 267 (2001) [Ex. 4].

31.    The actual fees paid by the Fidelity Magellan Fund to the Defendants makes this point.  For the three fiscal years ended March 31, 2003, investors paid management fees of $1.6 billion despite a loss of 24% in 2001, a loss in 2002 and a loss of 25% in 2003.  Over the last decade, investors in Magellan have paid $4 billion in management fees yet the Defendants' advice has lead to a significant under-performance compared to the Standard & Poor's 500 stock index (performance that can be purchased at a significantly lower cost).  In dollar terms, the fees paid by the Funds to the Defendants are staggering and constitute waste.

32.     In this action, Plaintiffs seek to rescind the advisory agreements and to recover all Portfolio Selection Fees paid by the Funds to the Defendants or, alternatively, to recover all fees paid to and received by the Defendants in violation of Section 36(b), including a recovery of all benefits resulting from economies of scale created by the Funds but wrongfully benefiting (and retained by) the Defendants during the period commencing one year prior to the filing of this Complaint through the date of final judgment after trial.   In addition, the Plaintiffs seek to recover all other excessive compensation received by Defendants in breach of their fiduciary duty under the ICA § 36(b), 15 U.S.C. § 80a-35(b).

## II. PARTIES

33.     Plaintiff Nancy Haugen, a resident of Phoenix, Arizona, is a shareholder of the Fidelity Magellan Fund.

34.     Michael F. Magnan, a resident of Mesa, Arizona, is a shareholder of the Fidelity Magellan Fund.

35.     Karen L. Magnan, a resident of Mesa, Arizona, is a shareholder of the Fidelity Magellan Fund.

36.     Rose M. Iannaccone, a resident of Phoenix, Arizona, is a shareholder of the Fidelity Magellan Fund.

37.     Presley C. Phillips, a resident of  Litchfield Park, Arizona, is a shareholder of the Fidelity Contrafund and Fidelity Magellan Fund.

38.     Andrea M. Phillips, a resident of Litchfield Park, Arizona, is a shareholder of the Fidelity Contrafund.

39.     Cindy I. Schurgin, a resident of Phoenix, Arizona, is a shareholder of Fidelity Magellan.

40.     Defendant Fidelity Management & Research Company ("FMR") is a Delaware corporation with its principal place of business in Boston, Massachusetts.  FMR is registered as

an investment adviser under the Investment Advisers Act of 1940 and is the investment adviser to the Funds, and other Fidelity Funds.

41.     Defendant FMR Co, Inc. ("FMRC") is a Delaware Corporation with its principal place of business in Boston, Massachusetts. FMRC is also registered as an investment adviser under the Investment Advisers Act of 1940 and is an investment sub-adviser to the Fund and other Fidelity Funds.

### III. JURISDICTION AND VENUE

42.     This action is brought pursuant to § 36(b) of the Investment Company Act of 1940 as amended, 15 U.S.C. § 80a-35(b).

43.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

44.     Venue is proper in this judicial district pursuant to 15 U.S.C. § 80a-43 and 28 U.S.C. § 1391(b)(2)-(3). Defendants are inhabitants of and transact business in this district, a substantial part of the events or omissions that give rise to Plaintiffs' claims occurred in this district, and Defendants may be found in this district.

### IV. GENERAL ALLEGATIONS

**The Investment Advisory Fees Charged by Defendants**

45.     As set forth in its Annual and Semi-Annual reports, the Funds pay a "management" fee to Defendants. The management fee compensates the Defendants for Portfolio Selection Services and certain "administrative" expenses.

46.     The management fees paid to the Defendants are paid as a percentage of assets under management. This ensures payment of an unfair fee in very large portfolios such as those of the Funds because as portfolios grow, they quickly create economies of scale and eventually the cost of servicing additional assets nears zero. A flat fee (in dollars, not percentages) or a breakpoint of near zero for very large portfolios would allow the Funds to capture their

economies of scale while also allowing the Defendants to earn a fair and competitive profit for their services.

47.    The way Defendants report fees is intended to, and does, obfuscate the total amount of fees received for pure Portfolio Selection Services.  The Defendants fail to break out this information in detail because shareholders, regulators, and others would then be more easily able to determine the egregious price-gouging engaged in by the Defendants.  This lack of transparency is compounded by Defendants' private ownership and the resulting lack of public reporting of Defendants' financial condition.

48.    Defendants have a duty to report on the Portfolio Selection Fees received from the Funds to the Funds' trustees and to the shareholders (including Plaintiffs).  Defendants' reports are not sufficient to properly inform either the trustees or the shareholders as to the true nature and amount of fees and other benefits paid to and received by the Defendants for Portfolio Selection Services.

49.    Despite the lack of clear and adequate reporting, the actual amount of fees paid to Defendants for pure Portfolio Selection Services can be accurately estimated.  As explained above, the management fee paid by each Fidelity Fund to the Defendants consists of both an administrative services component and a pure Portfolio Selection Fee (i.e., investment advice) component.    Subtracting the estimated administrative services component from the total management fee for the Fund leaves the fee charged for pure Portfolio Selection Services for the Fund.

50.    The portion of the management fee paid by the Funds to Defendants attributable to administrative costs is no more than 0.08% (8 basis points) of total assets because the much smaller Fidelity mutual fund known as the Fidelity Four-In-One Index Fund pays the Defendants (or their affiliates) an administrative management fee of only 8 basis points (0.08%) of assets under management.

13

51.    The Fidelity Four-In-One Fund requires little investment advice by virtue of its investment objective, namely, holding four pre-selected Fidelity funds in targeted proportions. For that reason, it pays the Defendants (or their affiliates) only 2 basis points (.02%) for Portfolio Selection Services.  However, the Four-In-One Index Fund has administrative costs that are similar in kind (but greater as a percentage of assets because it is smaller than the Fund) to those incurred by the Fund.  Thus, its 8 basis point (.08%) administrative fee expense is a valid assumption for the maximum administrative fee that the Funds could incur within the disclosed management fee for cost comparison purposes.

52.    The administrative costs portion of the total management fee charged by Defendants to the Funds is probably less than 8 basis points (0.08% of assets under management) because the Funds are dramatically larger than the Four-In-One-Index Fund.  At least one other large equity mutual fund separately reported that portion of the total management fee attributable to administrative costs as less than 10 basis points (0.10% of assets under management) and as little as 4 basis points (.04%).

53.    The Plaintiffs are confident that the administration expense component of the management fee charged to the Fund is less than 8 basis points for the additional reason, as evidenced by certain Funds breaking out this detail, that there are also economies of scale created in this area as assets grow (although these economies of scale may not grow as quickly as those associated with the Portfolio Selection Fees).

54.    The chart below sets forth the estimated amount of the Portfolio Selection Fee (i.e., the fee for pure securities selection and investment advice) charged by the Defendants during the most recent reported periods (annualized where based upon semi-annual data and excluding performance adjustments) assuming that 8 basis points (0.08% of assets under management) covers administrative costs included in that fee.

14

| Fund | Total Management Fee (percentage) | Less Administrative Component (percentage) | Estimate Pure Portfolio Selection Fee (percentage) | Estimated Pure Portfolio Selection Fee ($ in millions) |
|------|-----------------------------------|--------------------------------------------|----------------------------------------------------|--------------------------------------------------------|
| Magellan | 0.58% | 0.08% | .50% | $307 |
| Contrafund | 0.58% | 0.08% | .50% | $180 |

55.    The total fees paid by the Funds over time for Portfolio Selection Services are staggering.  Over the past decade, the Fidelity Magellan Fund alone has paid well over $3.3 billion in fees for pure Portfolio Selection Services for that Fund's single (underperforming) portfolio.    For the three-year period 2000 through 2002, Fidelity Magellan generated management fees of $1,820,612,000; for Fidelity Contrafund the figure was $785,886,000. Thus, these two funds alone, in the space of three years, generated management fees of more than $2.5 billion.  For year ended March 31, 2003, Magellan's management fee, excluding performance adjustments, was more than $313 million.  For year ended December 31, 2003, Contrafund's management fee, excluding performance adjustments, exceeded $208 million.

56.    Although the Defendants claim to be lower cost advisors than some competitors, they charge on average nearly three times more in percentage terms than Vanguard Fund (Vanguard averages 28 basis points while Fidelity averages 82 basis points) (source: Lipper and Morningstar) and four times more than Fidelity's other institutional clients.  When considering the size of the Funds' portfolios, such a claim only misleads the Plaintiffs and other Fund shareholders and becomes unfair and deceptive when viewing these fees in absolute dollar terms rather than percentages (again, because of the Funds' massive size).  Defendants' acceptance of these fees for pure Portfolio Selection Services is a breach of Defendants' fiduciary and other duties.

**The Gartenberg Test**

57.    As set forth in *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982) (decided long before today's computer and internet capabilities existed and before the in-depth studies by the GAO and SEC), the test for determining whether compensation paid to Defendants violates § 36(b) is "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." *Id.* at 928.    Stated differently, "the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargain." *Id.*

58.    As a threshold matter, it is clear that the Defendants cannot pass this test because there is already a universe of Fidelity contracts for Portfolio Selection Services. On information and belief, that universe establishes that the range of Portfolio Selection Fees negotiated with institutional clients (other than the Funds and other Fidelity Funds) for comparable size portfolios never even comes close to the level of Portfolio Selection Fees paid by the Funds. Thus, in determining whether the Fund's "fee schedule represents a charge within the range of what would have been negotiated at arm's-length," in practice, the Funds' fee schedule has never been within such a range.    Moreover, this information has been withheld by the Defendants from the Funds' board of trustees and from the shareholders, including the Plaintiffs.

59.    In applying this test, all pertinent facts must be weighed in determining whether a fee or other compensation violates § 36(b).    The *Gartenberg* court has specifically identified six factors (a portion of "all pertinent facts") to be considered in determining whether a fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been negotiated at arms' length.    A review of these factors, and the facts in this

16

1    case, demonstrate that receipt of the Portfolio Selection Fees by the Defendants violated (and

2    continues to violate) § 36(b).

3                                    **Economies Of Scale**

4        60.    As discussed in the introduction, there are significant economies of scale in the

5    money management and investment advisory business. These economies of scale exist at the

6    individual fund level (including the Funds) and at the complex or family of Funds level (meaning

7    all Funds advised by the Defendants considered together as a "complex" or "family of Funds").

8    They also exist on a more comprehensive basis, encompassing the Defendants' entire scope of

9    operations, including administrative expenses and advisory services provided to other

10   institutional clients.

11       61.    Courts, academic researchers, and the United States government have uniformly

12   found that these economies of scale exist. See, *Migdal v. Rowe Price Fleming Int'l, Inc.*, 248

13   F.3d 321, 326-27 (4th Cir. 2001); Freeman & Brown Study at 621 n.62 (quoting Victoria E.

14   Schonfeld & Thomas M.J. Kerwin, Organization of a Mutual Fund, 49 Bus. Law 107 (1993))

15   [Ex. 1]; Report on Mutual Fund Fees and Expenses (Dec. 2000) ("SEC Report"), at 30-31 [Ex.

16   2]; GAO, Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and

17   Hazardous Materials; and the Ranking Member, Committee on Commerce, House of

18   Representatives (June 2000) ("GAO Report"), at 9 [Ex. 3]. Thus, extensive and significant

19   economies of scale exist in the provision of investment advisory services, in particular Portfolio

20   Selection Services, by advisers such as Defendants to mutual funds such as the Funds.

21       62.    One simple example of economies of scale is when total assets under management

22   increase due purely to market forces. In that event, it is possible for the Defendants to service the

23   additional assets at zero additional variable cost, as there is no change in the securities held in the

24   portfolios or the number of shareholders in the Funds. Yet, the Defendants "charge" investors

25   more dollars in management fees for zero benefits conferred.

26

                                          17

63.    The Defendants have benefited from economies of scale resulting from pure market appreciation. On January 1, 1990, the Dow Jones Industrial Average was at 2753. When the decade closed on December 31, 1999, the Dow was at 11,497 (more than a four-fold increase). If a mutual fund merely held the stocks that comprise the Dow, and did nothing, the Portfolio Selection Fees would have quadrupled absent meaningful breakpoints (not the case with the Funds) or unless the advisers dramatically reduced their fees (also not the case with the Defendants).

64.    Today, even following three years of market declines, the Dow Jones Industrial Average is near 10,000, representing a three-and-one-half times increase from the levels of 1990. This growth has created enormous "free" economies of scale for the Funds, the benefits of which were wrongfully retained by the Defendants who incurred no additional costs in providing Portfolio Selection Services for the additional assets generated in the Funds by such market growth.

65.    Another simple example of benefits arising through no effort on the part of the Defendants yet creating considerable economies of scale occurs when the Funds' assets under management grow because of additional investments by current shareholders. Once again, economies of scale are created by the shareholders of the Funds, economies required to be shared with the Funds. Still, Defendants have failed to meaningfully reduce the Portfolio Selection Fees in either percentage or dollar terms.

66.    These facts regarding economies produced by market appreciation are confirmed by the GAO and by the Freeman and Brown Study. See GAO Report at 9 (noting that growth from portfolio appreciation is unaccompanied by a growth in costs) [Ex. 3]; Freeman & Brown Study. [Ex. 1 at p. 619-21].

67.    The assets in the Funds have grown dramatically over the past dozen years along with the growth generally in the stock market. As of late 1993 to early 1994 (depending on the

18

end of the individual Fund's fiscal year), total assets for the Magellan Fund and Contrafund amounted to about $36 billion. As most recently reported, assets in the Funds now exceed $100 billion, nearly 3 times more. By 1999, in fact, Magellan Fund held more assets than were held 20 years earlier by the entire mutual fund industry, including stock funds, bond funds, money market funds and international funds, all combined.

68.    Portfolio Selection Fees have also grown as the Funds increased in size, with Plaintiffs and the other shareholders receiving little or no benefit from the economies of scale generated by the Funds' dramatic growth. Since 1993, the Funds' portfolio management fees have increased in direct proportion to the increase in size of the Funds rather than some small fraction of that growth in light of the dramatic economies of scale caused by the tremendous growth in the Fund's total assets. Despite the lavish increase in compensation, Magellan Fund has lagged the S&P 500 index in performance over the last decade. Though Contrafund outperformed the S&P 500 index by about one percent over the last decade, Contrafund and Magellan combined did not.

69.    Defendants have received exorbitant compensation and, worse, have retained all of the benefits resulting from economies of scale, benefits that are owned by, and should have been paid to, the Funds.

70.    The sharing of these economies of scale with the Plaintiffs is required by § 36(b) yet the Defendants failed to do so. As a result, the Portfolio Selection Fees paid to Defendants are grossly disproportionate to the Portfolio Selection Services, are excessive, could not have been the product of an arms' length bargain, and violate § 36(b).

71.    Acceptance of the excessive Portfolio Selection Fees by Defendants was (and remains) a breach of Defendants' fiduciary and other duties to the Funds.

19

**Comparative Fee Structures**

72.    A mutual fund is a single client relationship for the Defendants, as with any other institutional client. Accordingly, with respect to the Portfolio Selection Services and the Portfolio Selection Fees, a mutual fund is no different from any other institutional investor.

73.    The fees charged by Defendants to other institutional investors for Portfolio Selection Services clearly establish that the Defendants are charging Portfolio Selection Fees to the Funds that are excessive and disproportionate to the value of the services rendered.

74.    Section 36(b) was enacted in response to excessive fees being charged by investment advisers and is legally applicable to all types of mutual funds, including money market funds. Most cases interpreting § 36(b), including *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 929 (2d Cir. 1982), involved money market funds. Money market funds have a completely different cost structure than equity funds, rendering money market funds incomparable to actively managed funds (including Magellan and Contrafund) that invest in securities held for longer periods of time with the potential for significant fluctuation in value. See Securities and Exchange Commission, Division of Investment Management: Report on Mutual Fund Fees and Expenses (Dec. 2000) (the SEC Report"), at 18 (excluding money market funds from study because of different cost structure) [Ex. 2]. Thus, the Portfolio Selection Fees (and their evaluation under Section 36(b)) should be compared not with money market funds but with other institutional client portfolios with comparable investment objectives.

75.    As noted by the Freeman & Brown Study, "[n]one of the leading advisory fee cases involved equity funds, and hence, none of the courts were confronted directly with the strong analogies that can be drawn between equity advisory services in the fund industry as compared to the pension field where prices are notably lower." Freeman & Brown Study at 653 [Ex. 1]. While a "manager may encounter different levels of fixed and variable research costs depending on the type of the portfolio, . . . the fundamental management process is essentially the same for large and small portfolios, as well as for pension funds and mutual funds. The

portfolio owner's identity (pension fund versus mutual fund) should not logically provide a reason for portfolio management costs being higher or lower." Freeman & Brown Study at 627-28 [Ex. 1]. The "'apples-to-apples' fee comparisons between equity pension managers and equity fund managers can be most difficult and embarrassing for those selling advice to mutual fund." Freeman & Brown Study at 67 1-72 [Ex. 1].

76.    Defendants provide advisory services to other institutional clients for substantially lower fees. The Freeman & Brown Study explains:

> Strong analogies . . . can be drawn between equity advisory services in the fund industry as compared to the pension field where prices are notably lower. [Freeman & Brown Study at 653 (Ex. 1]. [A] mutual fund, as an entity, actually is an institutional investor. When it comes to fee discrepancies, the difference between funds and other institutional investors does not turn on 'institutional status,' it turns on self-dealing and conflict of interest." [Freeman & Brown Study at 629 n. 93 (Ex. 1).

77.    The Freeman and Brown study is correct in its explanation of the similarity between the provision of Portfolio Selection Services to a mutual fund, like the Funds, and other institutional investors with similar investment objectives.

78.    The highly respected mutual fund analyst firm Morningstar has concluded that there should be no difference between management fees charged to mutual funds (retail products) and other institutional clients:

> Fees for a firm's retail products should not be materially different from management fees for a firm's institutional offerings. Though we appreciate the added costs of servicing small accounts, those expenses needn't show up in the management fees.

Kunal Kapoor, *The Standards That We Expect Funds to Meet*, Morningstar, December 8, 2003.

79.    The Defendants' retail products' (including the Funds') management fees differ materially from their other institutional offerings even though the added costs of servicing small accounts are fully recovered through "other costs" charged separately by and paid to the Defendants by the Funds. This violates Section 36(b).

80.    Fidelity Management Trust Company is a wholly owned subsidiary of FMR Corp., the corporate parent of the Defendants, and provides Portfolio Selection Services for other institutional clients. Fidelity Management Trust Company shares assets including space, resources, and advisory personnel with Defendants and provides identical portfolio management services. The management fees charged by Fidelity Management Trust Company to institutional investors are therefore properly compared to the fees charged by Defendants to the Funds.

81.    For example, the Fidelity Management Trust Company manages a stock portfolio for the Massachusetts Pension Reserves Investment Management Board (the "Massachusetts Pension Board"). This portfolio has approximately $580 million in assets managed by the Defendants' affiliate (as of 2002, the most recent data available). Although $580 million is a significant sum of money, it is a tiny fraction of the size of either of the funds at issue here.

82.    The Fidelity Magellan Fund is over 100 times larger. Contrafund is over 60 times larger. However, despite its significantly smaller size, the base management fee charged by Fidelity Management Trust Company to the Massachusetts Pension Board utilizes breakpoints (unlike the Funds) and, for assets in excess of just $200 million, the fee is "only" 20 basis points (.20%).

83.    Moreover, the overcharging of the Funds by the Defendants is understated more because the fee charged to the Massachusetts Pension Board includes not only Portfolio Selection Services, but also all administrative expenses incurred by Fidelity. By comparison, the total expense burden for the Fidelity Magellan Fund is 0.76% (76 basis points). Clearly, by definition, the portion of the fee charged to the Massachusetts Pension Board for pure Portfolio Selection Services is less than 20 basis points, far less than that charged to the Funds -- despite the huge size of their portfolios.

84.    In short, the Defendants' Portfolio Selection Fee (as a percentage of assets) charged to the Fund are more than double those charged much smaller institutional clients for the

1    same advisory services. When considered in dollar terms (rather than percentage), the Portfolio

2    Selection Fees are hundreds of times larger for the Funds' portfolios than other institutional

3    clients' portfolios. For example, the Fidelity Magellan Fund paid the defendants $1.6 billion in

4    management fees for the last three fiscal years while the Massachusetts Pension Board paid less

5    than $4 million for the same services (the additional costs for servicing numerous small fund

6    shareholder accounts is recovered by the Defendants through other fees paid by the Funds and

7    their shareholders and does not need to be recovered through Portfolio Selection Fees). As

8    another example, the Defendants offer an Annual Advisory Fee Schedule to small investors that

9    includes a maximum annual net advisory fee of 110 basis points (1.10%) for the first $500,000 in

10   assets but quickly declines to a maximum annual net advisory fee of 30 basis points (.30%) for

11   assets in excess of $8 million. Larger investors are offered fee schedules with even lower fees.

12         85.    The significant economies of scale created solely by virtue of the Plaintiffs' and

13   other shareholders' investment dollars have solely benefited the Defendants, to the detriment of

14   the Funds, in violation of Section 36(b).

15   **Fallout Benefits (Indirect Profits) To Defendants Attributable To The Funds**

16         86.    The Defendants also indirectly profit further because of "fallout benefits"

17   attributable to the Funds. Fallout benefits are often not quantified by the Defendants or shared

18   with the board of trustees even though the board cannot determine the fairness of any fee without

19   having this information.

20         87.    Fallout benefits include the attraction of new customers for other funds or

21   products offered by the Defendants, cross-selling Defendants' other funds and services to current

22   shareholders, and other benefits associated generally with the development of goodwill and the

23   creation and growth of a client base for the Defendants.

24         88.    Brokerage commissions payable by the Funds to the Defendants (or their

25   affiliates) constitute another fallout benefit. These commissions are paid as securities are bought

26

23

and sold at the Defendants' direction for the Funds. Commissions paid are huge. According to a study published in 2004 by the Zero Alpha Group, Magellan's brokerage commissions were more than $30 million, and added nearly .12 percent in expenses to Magellan's expense ratio, raising it from .88% to .9972 percent of net assets. For Contrafund, the impact of brokerage commissions was much greater. Contrafund's brokerage commissions were $73 million, and added .80 percent to Contrafund's expense ratio, raising it from .84 percent to 1.64 percent

89.     Another particularly secret and profitable fallout benefit to the Defendants is "soft dollar" payments. Essentially, "soft dollars" are credits to Defendants from broker-dealers and other securities industry firms in exchange for Defendants' routing securities transaction orders and other business to the broker-dealers.

90.     In breach of duties owed to the Funds, the Defendants pay excessive commissions to these persons to execute trades for the Funds in exchange for which the Defendants receive a form of rebate or kickback called soft-dollars. These soft-dollars are paid for by the Funds and the Plaintiffs with their hard earned dollars. They can amount to payments surpassing the total Portfolio Selection Fees paid to the Defendants, a critical fact withheld from the Funds' board of trustees.

91.     According to the SEC, "Soft-dollar arrangements create incentives for fund advisers to (i) direct fund brokerage based on the research provided to the adviser rather than the quality of execution provided to the fund, (ii) forego opportunities to recapture brokerage costs for the benefit of the fund, and (iii) cause the fund to overtrade its portfolio to fulfill the adviser's soft-dollar commitments to brokers." Memorandum from Paul F. Roye, director of the SEC Division of Investment Management, June 2003.

92.     As noted by the SEC, institutional investors other than mutual funds can negotiate "soft dollar" or commission recapture programs and directly participate in the "frequent flyer" type of benefits wrongfully enjoyed by the Defendants at the Funds' and the Plaintiffs' expense.

24

The Funds could, but do not, so negotiate because the Defendants have usurped that opportunity for their benefit at the expense of the Funds.

93.    Defendants or their affiliates also receive other benefits or "kickbacks," either directly or indirectly, such as transfer agency and custodian fees.  These fees automatically increase as the assets under management and the number of shareholders in the Funds increases.  Transfer agency fees alone add up annually to an additional 20 basis points (.20%) in revenues for the Defendants and their affiliate, Fidelity Service Company, Inc.  The profit from these and other fallout benefits is required to be thoroughly disclosed and vigorously debated by the trustees in determining whether the Portfolio Selection Fee is fair to the Plaintiffs and the Funds; such requirement has not been satisfied by the Funds and the Defendants.

94.    Defendants also benefit from securities lending arrangements where they "loan" out securities owned by the Funds (e.g., to short sellers) for a fee.

95.    These and other fallout benefits are required to be disclosed to the Funds' boards of trustees as part of the total mix of information necessary to determine the reasonableness of the Portfolio Selection Fee.  Even without considering the fallout benefits, the Portfolio Selection Fee is excessive in both percentage and dollar terms.  After considering the fallout benefits, the Portfolio Selection Fee is huge and its payment and receipt violates § 36(b).

**The Nature And Quality Of The Services Provided To The Fund's Shareholders**

96.    The nature of the Portfolio Selection Services provided to the Funds is straightforward: Defendants select (buy, sell or hold), at their discretion, stocks, bonds, and other securities for the Funds.  This is precisely the same service provided to Defendants' other institutional clients even though the Funds are charged a dramatically higher Portfolio Selection Fee as a percentage of assets under management and even higher in dollar terms.

97.    The quality of the Portfolio Selection Services provided to the Funds by Defendants is also precisely the same (because the services are the same) as the quality of the

Portfolio Selection Services provided to Defendants' other institutional clients. However, Plaintiffs pay Defendants dramatically higher percentage and absolute dollar fees (and generate enormous additional fallout benefits) because the Portfolio Selection Fees are not even close to the range of fees produced by the arms' length negotiations with the Defendants' other institutional clients.

98.    Moreover, the nature of the Portfolio Selection Services provided does not justify a higher Portfolio Selection Fee; it is the size of the fund, not its specialized nature, that determines a fair fee:

> We disagree with the premise that specialized fund strategies should result in higher expense ratios. Though we will make accommodations to reflect the higher costs inherent in running a smaller fund, we don't think funds of the same size ought to be charging materially different expenses.

Kunal Kapoor, *The Standards That We Expect Funds to Meet*, Morningstar, December 8, 2003.

99.    No accommodations need be made for the Defendants based on the "higher costs inherent in running a smaller fund," since the Magellan Fund is one of the largest in the world and Contrafund is not far behind. The reverse is true: accommodations for the benefit of the shareholders must be made to reflect the far lower costs in running a larger fund. No such accommodations were made by the Defendants.

### The Profitability Of The Fund To The Adviser-Manager

100.    The profitability to the Defendants of managing the Funds is a factor that should be considered. Intuitively, it is obvious that the fees charged to others in arms' length negotiations represent profitable transactions; otherwise, investment managers (such as the Defendants) intending to stay in business would be required to charge a higher fee. Accordingly, it is obvious that the management of the Funds (paying much higher Portfolio Selection Fees than other institutional clients) is highly profitable to the Defendants.

101.    "Profitability" is a function of revenues minus the costs of providing services. Although simple in definition, it is very problematic in practice in the mutual fund industry

26

because of bogus accounting. On information and belief, the Defendants arbitrarily allocate costs incurred in managing the Funds, other mutual Funds, and other institutional and retail clients' portfolios in order to "manage" profitability and mislead the board of trustees. With such allocations, the true profitability cannot be determined by reference only to the Defendants' financial statements -- precisely their goal.

102.    In addition, the Defendants are privately held and precise information regarding the actual or claimed profitability of the Funds to Defendants would not be available except through discovery even if it were maintained in an accurate and useable format. *See Krantz v. Fidelity Mgt. & Research Co.*, 92 F.Supp.2d 150, 159 (D. Mass 2000).

103.    One thing that is clear, however, is that size matters. There are higher cost ratios inherent in running a smaller fund and, conversely, lower cost ratios in running a larger fund. Magellan is one of the largest managed mutual funds in the world and, accordingly, should be the least expensive in the world to advise on the basis of costs divided by assets.

104.    Even without complete data, it is clear that the Magellan Fund is tremendously profitable to the Defendants. For example, the Fidelity Magellan Fund paid over $355 million in management fees during its recently ended fiscal year. Of that, as much as $306 million was for pure Portfolio Selection Services. In contrast, in 1993 the management fee (even before deducting administrative expenses reported together with management fees) was "only" $186 million. The payment and receipt of such a dramatic increase in fees for pure Portfolio Selection Services (fees totaling almost $4 billion over the last decade in the face of dramatic economies of scale) while managing comparable (but much smaller) portfolios for a much smaller fee is a breach of Defendants' fiduciary and other duties to the Funds and their shareholders, including Plaintiffs.

105.    In addition, as discussed above under "comparative fee structures," Defendants have entered into advisory agreements with other institutional clients where Defendants accept

27

total management fees (including both Portfolio Selection Fees and payment of all administrative, distribution and other costs) of 20 basis points (.20%) to manage portfolios that are but a fraction of the size of the Funds' portfolios. Even if one were to conservatively assume that all of the other institutional clients' fee was for Portfolio Selection Services, it is still dramatically smaller in percentage terms (and shockingly so in dollar terms) than that charged to the significantly larger Funds and is not within the range established by the Defendants with its other customers when negotiating at arms' length. Because Defendants would not agree to provide advisory services for a fee of 20 basis points or less if it were not profitable to do so, the immense profitability to Defendants of the Funds paying at least twice as much in percentage terms (and far more in dollar terms) for Portfolio Selection Services as (modestly-sized) institutional clients for the same services is self-evident.

### The Independence And Conscientiousness Of The Trustees (Or Directors)

106.    As the GAO Report noted, the "external management" structure of most mutual funds (including the Funds) creates a potential conflict of interest between a fund's shareholders and its adviser. [Ex. 3]. The United States Supreme Court has stated that the disinterested director requirement is "the cornerstone of the ICA's efforts to control" this conflict of interest. *Burks v. Lasker*, 441 U.S. 471 (1979).

107.    The disinterested directors (or trustees) are supposed to serve as "watchdogs" for the shareholders of the Funds. As such, the disinterested directors have primary responsibility for, among many other things, negotiating and approving all agreements with Defendants and reviewing the reasonableness of the Portfolio Selection Fees received by Defendants. Accordingly, as noted by the GAO, the directors are expected to review, among other things, the adviser's costs, whether fees have been reduced when the Funds' assets have grown, and the fees charged for similar services. *See* GAO Report at 14 [Ex. 3]. These responsibilities necessarily require the directors to rely on information provided by Defendants. Defendants, in turn, have a

28

fiduciary duty to provide all information reasonably necessary for the directors to perform its obligations.

108.    At least 40% of the Funds' directors must be "disinterested" as defined in § 10 of the Investment Company Act.  The ICA contains a presumption that the disinterested directors are in fact disinterested.  However, even in connection with so-called disinterested directors, the lack of conscientiousness in reviewing the fees paid by the Funds, the lack of adequate information provided by the Defendants to the board in connection with its approvals of the advisory agreements, and the control of management over the board in reviewing the fees paid by the Funds are not presumed.  Rather, they are all relevant factors in determining whether the Defendants have breached their fiduciary duties to the Plaintiffs and the Funds.

109.    The SEC has specifically recognized that even disinterested directors may not be independent but, rather, may be subject to domination or undue influence by a fund's investment adviser.  For example, in the related context of distribution fees, "disinterested directors should not be entrusted with a decision on use of fund assets for distribution without receiving the benefit of measures designed to enhance their ability to act independently." Bearing of Distribution Expenses by Mutual Fund, Investment Co. Act Rel. No. 11414, 1980 SEC LEXIS 444 at *36 (Oct. 28, 1980).  Here, no such benefits were received by the disinterested directors.

110.    Despite the structural protections of independent directors envisioned by the Investment Company Act, the Funds' trustees have been subverted by Defendants and no longer serve in their "watchdog" role.  This subversion was (and remains) a breach by the Defendants of the fiduciary duties owed to the Funds.

111.    Further, the Defendants have failed to satisfy their fiduciary duty under the Investment Company Act to provide the Funds' trustees with all information reasonably necessary for them to do their jobs, including determining the fairness of the Portfolio Selection Fee.

29

112.    Jack Bogle, founder of the Vanguard Group, one of the largest mutual fund complexes in the world, commented during an interview on the failure of mutual fund boards of directors to meet their duties under the Act:

> Q: We've talked about how the [mutual fund] industry could do a better job. How about the fund directors?
>
> A: Well, fund directors are, or at least to a very major extent, sort of a bad joke. They've watched industry fees go up year after year, they've added 12b-1 fees. I think they've forgotten, maybe they've never been told, that the law, the Investment Company Act, says they're required to put the interest of the fund shareholders ahead of the interest of the fund adviser. It's simply impossible for me to see how they could have ever measured up to that mandate, or are measuring up to it.

113.    Similarly, a United States District Court Judge recently quoted Warren Buffett, the "legendary investor and chairman of the Berkshire Hathaway Group" on the lack of independence and diligence of mutual fund boards of directors:

> I think independent directors have been anything but independent. The Investment Company Act, in 1940, made these provisions for independent directors on the theory that they would be the watchdogs for all these people pooling their money. The behavior of independent directors in aggregate since 1940 has been to rubber stamp every deal that's come along from management — whether management was good, bad or indifferent. Not negotiate for fee reductions and so on. A long time ago, an attorney said that in selecting directors, the management companies were looking for Cocker Spaniels and not Dobermans. I'd say they found a lot of Cocker Spaniels out there.

*Strougo v. BEA Assoc.*, 188 F. Supp. 2d 373, 383 (S.D.N.Y. 2002) (citation omitted).

114.    The dependence of the Funds' disinterested directors (trustees) on the Defendants, and the domination and undue influence exerted on them by the Defendants, is evidenced by the following facts:

a.    Each of the Fidelity group of funds is governed by a common and interlocking board of directors initially selected (and constantly dominated by) the Defendants.

b.      All 277 different Fidelity mutual funds are "overseen" by one common board of 14 directors, 10 of whom are considered "disinterested." These "disinterested" directors earn an average salary of $263,000 annually for approximately 11 board meetings each year. The Defendants have de facto control over compensation, nature and duration of meetings and other aspects of the Fund's corporate governance, thereby depriving the Fund of the independence owed to them by the trustees.

c.      Magellan Fund, Contrafund and all other funds within the Fidelity family of equity mutual funds, share common fiduciary advisers (i.e., the Defendants or their affiliates). The Defendants created these relationships and continue to dominate in their execution.

d.      Magellan Fund, Contrafund and all funds within the Fidelity family of equity mutual funds, share a common distributor affiliated with the Defendants (i.e., each fund's shares are sold by an affiliate of the Defendants).

e.      The trustees rely wholly on the Defendants to provide them with what is known in the industry as a "Lipper Package." The Lipper Package includes information about what other mutual fund investment advisors charge their mutual fund clients but does not include data about other institutional clients (that data is withheld by the Defendants from the trustees). The Defendants use the data in the Lipper Package to ensure that their fees fall within the range of fees charged by their "competitors," an industry of price gougers, rather than to ensure that the Portfolio Selection Fees are independently fair to the Funds.

f.      Magellan Fund, Contrafund and all other funds within the Fidelity family of mutual funds, have access to a common line of credit arranged by the Defendants to assist in managing money flows in the Funds (e.g., to meet shareholder redemptions). The fees pertaining to such credit facility are shared equally by the Magellan and all other funds within the Fidelity family (thereby also again demonstrating benefits from economies of scale).

g.    It appears that the Magellan Fund and Contrafund use the same auditor as the Defendants.    The selection of a common auditor (one of the most important aspects of a disinterested director's responsibilities) is evidence of the domination and control of the disinterested directors by Defendants. Further, PriceWaterhouseCoopers LLP identifies "Fidelity Investments" as a client, suggesting that it audits Defendants' books as well as the Funds' books. Such a common auditor creates clear potential for conflicts of interest and demonstrates the control asserted by the Defendants over the Funds.

115.    Finally, the trustees do not receive adequate information regarding fees paid to the Defendants by other institutional clients so as to allow them to meet their fiduciary duty to determine the reasonableness of those fees.    This is in part because the Defendants have failed to provide that information and in part because the board has failed to request it.    In doing so, the board and the Defendants have breached their fiduciary duty to the Funds.

**COUNT I**
**ICA § 36(b) BREACH OF FIDUCIARY DUTY**
**(EXCESSIVE FEES FROM ECONOMIES OF SCALE)**

116.    The Plaintiffs repeat and reallege paragraphs 1 through 110, inclusive, of this complaint.

117.    The Defendants have received and continue to receive excessive Portfolio Selection Fees attributable to the extraordinary economies of scale created by the Plaintiffs and the Funds.

118.    Defendants have breached and continue to breach their ICA § 36(b) fiduciary duty to the Funds by charging and retaining these excessive fees.

119.    Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, the "amount of compensation or payments received from" the Funds.

32

**COUNT II**
**ICA § 36(B) BREACH OF FIDUCIARY DUTY**
**(EXCESSIVE INVESTMENT ADVISORY FEES)**

120.    Plaintiffs repeat and reallege paragraphs 1 through 110, 112 and 113, inclusive, of this complaint.

121.    The Portfolio Selection Fees charged by the Defendants are and continue to be disproportionate to the services rendered and not within the range of what would have been negotiated at arms' length in light of all the surrounding circumstances (or the range of what has been negotiated at arms' length with the Defendants' other institutional clients). Instead, they are dramatically higher than those negotiated or that would be negotiated in any arms' length negotiation.

122.    In charging and receiving excessive advisory fees, and failing to put the interests of the Funds, the Plaintiffs and the Funds' other shareholders ahead of their own interests, Defendants breached their statutory fiduciary duties to the Funds and the Plaintiffs.

123.    Defendants have breached and continue to breach those statutory ICA § 36(b) fiduciary duties to the Funds by accepting excessive and inappropriate compensation. Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, "the amount of compensation or payments received from" the Funds.

WHEREFORE, the Plaintiffs demand judgment as follows:

a.      Declaring that the Defendants violated and continue to violate § 36(b) of the ICA and that any advisory agreements entered into between them and the Funds are void ab initio;

b.      Preliminarily and permanently enjoining the Defendants from further violations of the ICA;

c.      Awarding damages against the Defendants in an amount including all Portfolio Selection Fees paid to them by Plaintiffs and the Funds for all periods not precluded by any

33

applicable statutes of limitation through the trial of this case, together with interest, costs, disbursements, attorneys' fees, and such other items as may be allowed to the maximum extent permitted by law;

      d.    Awarding prospective relief in the form of reduced Portfolio Selection Fees in the future based not simply upon a percentage of assets formula but also based upon the reasonableness of those fees in absolute dollar terms when considering the assets under management in the Funds; and

      e.    Such other and further relief as may be proper and just.

      DATED this 3rd day of May, 2004.

KELLER ROHRBACK P.L.C.

By: _____
    Gary Gotto, Bar No. 007401
    Ron Kilgard, Bar No. 005902
National Bank Plaza
3101 North Central Avenue, Suite 900
Phoenix, AZ 85012
Telephone: 602-248-0088
Facsimile: 602-248-2822

Lynn Lincoln Sarko
Michael D. Woerner
Gretchen F. Cappio
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

Michael J. Brickman
James C. Bradley
Nina H. Fields
RICHARDSON, PATRICK, WESTBROOK &
BRICKMAN, LLC
174 East Bay Street
Charleston, SC 29401
Telephone: 842-727-6500
Facsimile: 843-727-3103

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Guy M. Burns
Jonathan S. Coleman
Becky Ferrell-Anton
JOHNSON, POPE, BOKOR, RUPPEL &
BURNS, L.L.P.
100 North Tampa Street, Ste. 1800
Tampa, FL 33602
Telephone: 813-225-2500
Facsimile: 813-223-7118

Attorneys for Plaintiffs

\\KRFILE\DATA\CLIENTS\26382\1\PLEADINGS\FIDELITYCOMPLAINT042804.DOC